# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:16-CR-00019-03 |
| v. | (Chief Judge Brann) |
| KALIF ENGLISH, | |
| Defendant. | |

## MEMORANDUM OPINION

### OCTOBER 5, 2022

## I.   BACKGROUND

In 2016, Kalif English was charged in a superseding indictment with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and four counts of distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).[1] In September 2018, English entered into a plea agreement with the Government.[2]

In the plea agreement, English agreed to plead guilty to conspiracy to distribute 1,000 grams or more of heroin, in violation of 21 U.S.C. § 846.[3] The Government agreed to drop the remaining charges against English at the time of sentencing and recommend a three-level reduction in offense level for acceptance of responsibility.[4] Although the parties reached certain agreements regarding

---

[1]   Doc. 25.
[2]   Doc. 1127.
[3]   *Id.* at 1.
[4]   *Id.* at 2, 9-10.

sentencing issues, the plea agreement made clear that the Court was not bound by the agreement and could impose any sentence up to the maximum sentence allowable by statute.[5] The plea agreement further noted that English was, to that point, satisfied with the assistance that he had received from his attorney, who had discussed the case and plea agreement in detail with English.[6]

The Court thereafter conducted a change of plea colloquy with English.[7] English was placed under oath and affirmed that he was satisfied with his representation to that point.[8]

During the colloquy, English confirmed that he understood that he faced a mandatory minimum term of ten years' imprisonment along with a maximum term of life imprisonment.[9] Although both defense counsel and the Government estimated that the advisory sentencing guidelines range under the *United States Sentencing Guidelines Manual* would be 210 to 262 months' imprisonment, English understood that this was only an estimate, and that, if the Court determined that his "guideline sentence is different from what has been estimated this afternoon," English would not be permitted to withdraw his guilty plea.[10] English further understood that the

---

[5]  *Id.* at 20.
[6]  *Id.* at 26.
[7]  Doc. 1434.
[8]  *Id.* at 2, 5.
[9]  *Id.* at 8-9.
[10]  *Id.* at 10. *See also id.* at 11 (informing English that "a United States probation officer from this federal district will prepare a presentence report which will set your guideline sentencing range. If you disagree with the report, this guilty plea is still binding on you.").

2

guidelines range was advisory only, and the Court had "the authority to impose a sentence that is more severe or less severe than the sentence prescribed by the guidelines."[11]

English also understood that, although his attorney and the Government could make recommendations to the Court, the Court was not bound by the recommendations and could disregard them, and English would still be bound by his guilty plea.[12] Moreover, English understood that no one could guarantee what sentence he may receive at sentencing.[13]

English confirmed that he had voluntarily signed the plea agreement and that his attorney had adequately explained the agreement to him.[14] English further stated that no one made any promises to him other than those contained in the plea agreement, no one had threatened or coerced him into pleading guilty, and he was pleading guilty of his own free will.[15] At the change of plea hearing, the Government recounted the major terms of the plea agreement, and English confirmed that the Government's recitation of the agreement comported with his understanding of the significant terms of the agreement.[16]

---

[11] *Id.* at 12.
[12] *Id.* at 11-12, 16-17.
[13] *Id.* at 12.
[14] *Id.* at 13.
[15] *Id.* at 17-18.
[16] *Id.* at 13-16.

The Government then set forth the facts that it asserted it could prove if the matter were to proceed to trial. The Government averred that "Kalif English operated a drug trafficking network along the Interstate 80 corridor from the Williamsport area to Bloomsburg and vicinity and down to Philadelphia and South Jersey."[17] He and other coconspirators "managed the other co-defendants in crews that used seven separate cell phones to supply the drug customers with heroin."[18] The Government summarized the criminal conduct in this manner:

> The hallmark of this organization was its ability to quickly respond to customers' heroin orders and then deploy throughout the region to deliver heroin to numerous customers at motels, shopping malls, and commercial locations in and around Williamsport, Bloomsburg, and other communities along Interstate 80.
>
> When the crews sold out their heroin supplies, they stopped responding to customer calls to the work phones, traveled to Philadelphia for additional supplies in Philadelphia, and then a few days later, on the return trip to central Pennsylvania, sent out mass text messages to drug customers that new supplies of heroin were available.
>
> Members of this organization used at least seven prepaid mobile work phones, or traps, to answer customer calls for heroin and arrange meetings to deliver the drug at designated locations. Often the work phones were put in forwarding mode to the other phones to maintain continuous service, if one of the persons holding a particular work phone was in Philadelphia or out of the area, or if a phone was seized by police.
>
> Although on a number of occasions the work phones were seized during traffic stops and arrests, customer traffic to the phone numbers never waned. The conspirators simply obtained other prepaid cell phones and transferred the widely-known work phone numbers to the new devices when they initiated service on the new phones. A core set of about four

---

[17]   *Id.* at 18.
[18]   *Id.*

cell phone numbers, well known to a loyal network of drug customers, represented the digital business platform for this wide-ranging drug trafficking organization.

During the period of the conspiracy from August 2014 through the date of the indictment, Kalif English, Sharonda Walker, Keith Harding and Shakeen Taylor, operated and managed trap cell phones to distribute heroin. Heroin customers called the cell phones and were directed by English, Walker, Keith Harding, Shakeen Taylor, Nasheen Taylor, Naheem Stinnet, Corey Hughes and other conspirators to various meeting locations in the Williamsport region. English drove to various locations in the Williamsport, Mansfield, Danville and Bloomsburg areas, where he met heroin customers who had called the work phone. He received money from the customers in exchange for heroin.

English and Hughes also met heroin customers and delivered heroin in such places as the Lycoming County Mall, Buffalo Wild Wings and Gander Mountain.

As charged in count two, on or about March 16, 2015, Williamsport police officers recovered 231 bags of heroin during a pursuit of English through the Timberland Estates apartment complex. When an officer approached him about crossing the street outside the crosswalk, English ran away. And during his flight English threw the heroin bags into some bushes. Surveillance video showed English throwing objects into the bushes where the heroin was recovered. Police also recovered $1,879 from English's pants pocket.

English fielded customer orders on target telephone number one, an intercepted trap cell phone facility, and dispatched other members of the group, including Corey Hughes, to deliver heroin to them.

For instance, as charged in count five, on August 3, 2015, English spoke to a confidential human source, or CHS, on that number and arranged a meeting location for the delivery of 60 bags of heroin. Hughes appeared at the location driving a back Audi and delivered heroin to the CHS in exchange for $500.

That same day, as charged in count six, following a police pursuit in Montoursville, English fled on foot from a white Dodge Durango. Inside that vehicle police found one of English's work cell phones,

known as intercepted line target telephone number two, and multiple blue bags of heroin and additional bags of crack.

A Wal-Mart receipt for a transaction that date found in the vehicle matched the time of store surveillance video placing English in the Wal-Mart at that same time. English and Hughes continued their drug trafficking activities during the period of Title III interception.

. . .

As charged in count one (sic), on the evening of January 19, 2016 during physical surveillance of his drug trafficking activities at a Comfort Inn Motel in Bloomsburg, English observed investigators inside the motel and fled in a vehicle that he had been using to make heroin deliveries earlier that evening. Investigators later located the vehicle in Bloomsburg. And during the execution of a search warrant on January 21, 2016, they recovered 201 bags of heroin and packaging materials secreted in the vehicle.

Despite these business disruptions, English, while on the run, maintained phone contact with conspirator, Sharonda Walker, whose phone was being intercepted. On Walker's intercepted cell phone, target telephone number five, Walker and English continued to discuss recent searches of motel rooms, the encounter with the investigator and English in the motel and a new cell phone obtained by English to conduct drug-related communications.

They also discussed the arrest of co-defendant Keith Harding and the arrest and seizures of heroin and other drugs at the Grand View Motel and Hampton Inn, as well as various pending federal indictments of co-defendants in this case.

English and Sharonda Walker also posted various messages on social media sites, posts which described how much money they were generating from the operation of trap cell phones. As English stated in one message, quote, Trap phone do a number, den you blessed, closed quote.

Kalif English, Sharonda Walker, Corey Hughes, Troy Brown and other members of the conspiracy received firearms from heroin customers and paid them heroin or cash for the guns.

As a result of his participation in the conspiracy to distribute controlled substances, English was responsible for the distribution of more than one kilogram but less than three kilograms of heroin.[19]

English agreed with those facts, with the exception of the use of the "words operated and managed," as English contested "that he was a manager or leader" in the conspiracy.[20] The Court found that English was competent to plead guilty and that his plea was knowing and voluntary.[21] This Court therefore accepted English's guilty plea.[22]

A presentence report was thereafter prepared.[23] The PSR calculated a base offense level of 30 because English was responsible for distributing more than one, but less than three, kilograms of heroin.[24] The PSR increased the offense level by two levels because English possessed firearms in connection with his drug trafficking activities,[25] by two levels because he committed the offense as part of a pattern of criminal conduct engaged in as a livelihood,[26] and by four levels because English was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.[27] The PSR subtracted two levels for

---

[19]   *Id.* at 18-23.
[20]   *Id.* at 24. *See id.* at 24-26.
[21]   *Id.* at 26-27.
[22]   *Id.* at 27.
[23]   Doc. 1258.
[24]   *Id.* at 15; U.S. Sentencing Guidelines Manual § 2D1.1(c)(5) (2018).
[25]   Doc. 1258 at 15; USSG § 2D1.1(b)(1).
[26]   Doc. 1258 at 15; USSG § 2D1.1(b)(16)(E).
[27]   Doc. 1258 at 15; USSG § 3B1.1(a).

acceptance of responsibility, resulting in a total offense level of 36.[28] English had a lengthy criminal history, and the PSR calculated ten criminal history points, resulting in a criminal history category V.[29] The PSR therefore calculated an advisory Sentencing Guidelines range of 292 to 365 months' imprisonment.[30] English objected to, *inter alia*, the sentencing enhancements for possession of a firearm in connecting with drug trafficking, and for being an organizer or leader of criminal activity involving five or more people.[31]

At sentencing, the Government argued that English possessed firearms during the conspiracy, as wiretaps of his phones revealed that he, "along with his direct co-conspirator, Corey Hughes, regularly accepted guns in trade for bricks and bundles of heroin. It's pretty evident that that was a common means of exchange within the network that this defendant devised and operated."[32] The Government recounted one of those phone calls:

> on December 4, 2015, an unidentified male calls the phone operated by Kalif English, and English answers, "Yo." The male says, "Hey, Skinny." English says, "What's up?" The male says, "It's a 45 fully auto, he got two clips. Brand new." English says, "Ah, come on, Bro, bring it." The male says, "You really want, you really want it." And English says, "Yeah, Bro." And the male says, "You got the cash for it?" English—there's an inaudible portion. "Bro, I don't want to talk over the phone or nothing like that. Just bring it." The male says, "All right. You cash and trade, I'll bring it. All right."[33]

---

[28]   Doc. 1258 at 15; USSG § 3E1.1(a).
[29]   Doc. 1258 at 17-19.
[30]   *Id.* at 23.
[31]   Doc. 1328.
[32]   Doc. 1408 at 5.
[33]   *Id.* at 24.

The Government further stated that investigators at Columbia County Prison "interviewed a probation violator, who reported that she purchased two guns for Kalif English" as a straw purchaser.[34] Moreover, the Government noted that, during an incident in 2014, English was a passenger in a vehicle that was stopped; English and the other occupants fled into an apartment and, when that apartment was searched, law enforcement discovered firearms.[35]

As to English's objection to the enhancement for being a leader or organizer of the conspiracy, the Government relayed that English "effectively pioneered" the drug trafficking organization and "developed a digital platform using cellular telephones in order to service a broad customer base over a broad geographic territory."[36] English then essentially "franchised" the network that he had developed to other people.[37]

This Court overruled English's objections. With respect to the objection to the firearm enhancement, this Court concluded that the evidence—specifically the wiretapped conversations—established that "on at least two occasions, December 4, 2016, and December 6, 2016, Mr. English dealt in trades of heroin for guns" and therefore the enhancement was applicable.[38] With respect to English's objection to

---

[34] *Id.* at 6.
[35] *Id.* at 6-7.
[36] *Id.* at 8.
[37] *Id.*
[38] *Id.* at 26-27.

the leadership enhancement, the Court determined that English developed the trap phone business model, recruited several individuals to participate in the organization, and ultimately franchised out the business and generated up to $10,000 per day in heroin proceeds.[39] The Court granted an additional one-level decrease in English's offense level for acceptance of responsibility, and therefore calculated an offense level of 35 and criminal history category V, resulting in a Sentencing Guidelines range of 262 to 327 months' imprisonment.[40] The Court sentenced English to 262 months' imprisonment.[41]

English thereafter filed an appeal with the United States Court of Appeals for the Third Circuit, challenging the imposition of sentencing enhancements for being an organizer or leader of the drug trafficking conspiracy and for possessing a firearm during the conspiracy.[42] The Third Circuit rejected English's challenges. First, it determined that there was "substantial evidence that English began the trap-phone scheme, recruited others to help manage the network, sent subordinates to sell heroin, and supervised the network" and "the Government had direct evidence from a confidential informant and surveillance that English directed a subordinate to sell heroin more than once" all of which supported the application of the sentencing enhancement for being a leader or organizer of the conspiracy.[43] Second, the Third

[39] *Id.* at 27-28.
[40] *Id.* at 28-29.
[41] *Id.* at 57; Doc. 1345.
[42] *United States v. English*, 804 F. App'x 144, 145 (3d Cir. 2020).
[43] *Id.* at 146-47.

Circuit concluded that the application of the firearm enhancement was warranted because "wiretapped conversations show[ed] that English regularly accepted guns in trade for bricks and bundles of heroin" and "English and his coconspirators received firearms from heroin customers and paid them heroin or cash for the guns."[44]

On June 24, 2021, English filed a 28 U.S.C. § 2255 motion challenging his conviction and sentence based primarily upon allegations of ineffective assistance of counsel.[45] Specifically, English argues that plea counsel was ineffective in failing to call witnesses to rebut the Government's case regarding the sentencing enhancements for possessing a firearm during the conspiracy and being a leader or organizer of the conspiracy.[46]

English further asserts that his guilty plea was not knowing and voluntary,[47] as English's attorney entered his appearance in the case shortly before the change of plea hearing, leaving English with an "impossible . . . decision—seek a continuance or accept a guilty plea to hope that he would receive a more lenient sentence."[48] Based on these same facts, English contends that he was denied his Sixth Amendment right to counsel.[49]

---

[44]   *Id.* at 147-48 (internal quotation marks omitted).
[45]   Doc. 1544.
[46]   *Id.*
[47]   *Id.* at 7.
[48]   Doc. 1589 at 4-5.
[49]   Doc. 1544 at 8.

The Government has responded to English's § 2255 motion, and asserts that the motion is time-barred, as it was filed beyond the one-year limitations period, and equitable tolling does not apply.[50] The Government further argues that English's sentencing issues were rejected on direct appeal and therefore may not be raised in a § 2255 motion.[51] Finally, the Government contends that English knowingly and voluntarily entered his guilty plea,[52] and plea counsel was not ineffective as overwhelming evidence, including English's own admissions, established the applicability of the sentencing enhancements and English suffered no prejudice from the failure to call certain witnesses at the sentencing hearing.[53]

English's attorney has filed a reply brief, rendering this matter ripe for disposition.[54] For the reasons discussed below, the Court will deny English's motion.

## II.     DISCUSSION

### A.     Timeliness of the Motion

As a general matter, 28 U.S.C. § 2255 motions must be filed within one year of the date upon which a defendant's conviction becomes final.[55] Where a defendant does not file a petition for a writ of certiorari with the United States Supreme Court on direct appeal, a conviction becomes final "when the time for filing a certiorari

---

[50]   Doc. 1601 at 29-32.
[51]   *Id.* at 32-34.
[52]   *Id.* at 37-38.
[53]   *Id.* at 39-51.
[54]   Doc. 1602.
[55]   28 U.S.C. § 2255(f)(1).

petition expires"[56]—ninety days after the court of appeals enters judgment on the appeal.[57]

Here, the Third Circuit issued its judgment on English's appeal on March 17, 2020.[58] English did not petition the Supreme Court for certiorari, meaning that his conviction became final ninety days later, on June 15, 2020. English's § 2255 motion was therefore due on or before June 15, 2021. English did not file his motion until June 24, 2021, and it is therefore uncontested that English's motion is facially untimely.[59] Nevertheless, English argues that his motion is timely pursuant to the doctrine of equitable tolling.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."[60] "As with most issues involving a court's exercise of equitable powers, there are no bright lines in determining whether equitable tolling is warranted in a given case."[61] "Thus, [courts] must 'exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in

---

[56]   *Clay v. United States*, 537 U.S. 522, 527 (2003).

[57]   *See id.* at 532 (noting that § 2255 "ties the limitation period to the date when the judgment of conviction becomes final" (internal quotation marks omitted)).

[58]   Doc. 1473.

[59]   *See* Doc. 1602 at 1 (English acknowledging that the limitations period ran on "June 15, 2021 and Defendant's motion was actually filed on June 24, 2021" but arguing that the limitations period should be tolled).

[60]   *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

[61]   *Ross v. Varano*, 712 F.3d 784, 799 (3d Cir. 2013) (brackets and internal quotation marks omitted).

an appropriate case.'"[62] "[E]quitable tolling is appropriate when principles of equity would make the rigid application of a limitation period unfair, but . . . a court should be sparing in its use of the doctrine."[63]

First, as to whether a movant has been diligently pursuing his rights, "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum, extreme, or exceptional diligence."[64] "A determination of whether a petitioner has exercised reasonable diligence is made under a subjective test: it must be considered in light of the particular circumstances of the case."[65]

Here, the Court concludes that English did not diligently pursue his rights. English notes that his attorney attempted—on three occasions—to mail documents to English in April and May of 2021, although all three times the mail was returned to counsel.[66] English was also apparently transferred four times in the "months prior to the one-year deadline."[67] However, these explanations are insufficient to demonstrate diligence.

First, while these issues may explain a delay of approximately two months, it does not demonstrate any diligence over the prior ten months that English had to file his motion. Had English "advanced his claims within a reasonable time of their

---

[62]   *Id.* (quoting *Holland v. Florida*, 560 U.S. 631, 650 (2010)).
[63]   *Id.*
[64]   *Id.*
[65]   *Id.*
[66]   Doc. 1602 at 2, 10-14.
[67]   *Id.* at 2.

availability, he would not now be facing any time problem" with his § 2255 motion.[68]

Second, English was represented by counsel, and there is no explanation why counsel required paperwork from English to file a § 2255 motion. Counsel was—or should have been—aware in April and May of 2021 that the deadline to file English's § 2255 motion was rapidly approaching. Counsel could have, and should have, filed a simple placeholder motion that would have preserved his client's rights in this matter and demonstrated proper diligence.[69] Moreover, counsel's failure to file such a motion does not excuse English's untimely filing.[70]

Third, although counsel apparently had difficulty mailing documents to English, there is no explanation for why counsel did not hand deliver those documents to English at his place of incarceration. There simply is no reason why a counseled § 2255 motion could not have been timely filed prior to the deadline, and the Court therefore concludes that English has failed to demonstrate due diligence.

---

[68] *Pace*, 544 U.S. at 419. *Cf. United States v. Thomas*, 713 F.3d 165, 174 (3d Cir. 2013) (finding no diligence where the movant "was in federal custody with access to legal materials for approximately nine months, including almost seven weeks leading up to the expiration of his limitations period").

[69] *Cf. Brown v. Shannon*, 322 F.3d 768, 774 (3d Cir. 2003) (prisoner did not act with reasonable diligence where "there was nearly one month left in the limitation period-time enough for Brown, acting with reasonable diligence, to prepare and file at least a basic pro se habeas petition").

[70] *See Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001) (noting that "attorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the 'extraordinary' circumstances required for equitable tolling").

Additionally, English has not demonstrated that extraordinary circumstances prevented him from timely filing his motion. Although mail sent by English's attorney was returned to sender three times, in an analogous situation the United States Court of Appeals for the Second Circuit noted, "[w]e are aware of no case holding that a delay occasioned by the normal course of the mail, as lengthened by a regularly scheduled holiday, constitutes an 'extraordinary' circumstance for purposes of equitable tolling."[71] Similarly, the United States Court of Appeals for the Ninth Circuit has concluded that prison mail system "'delays [are] inherent in the process of prison communication,' [and] do not amount to an extraordinary circumstance."[72]

This is particularly true here where English and his attorney waited several months before attempting to complete and file the § 2255 motion. "Equitable tolling is predicated on *excusable* neglect . . . but such an assertion rings hollow when a plaintiff . . . despite being represented by several experienced attorneys—sits on her claims without explanation and then races to court just before the filing deadline."[73] When parties engage in such conduct, they "have only themselves to blame when Murphy's law comes knocking."[74] Consequently, issues that English may have

---

[71] *Saunders v. Senkowski*, 587 F.3d 543, 550 (2d Cir. 2009).
[72] *Shorb v. Nooth*, 727 F. App'x 442, 443 (9th Cir. 2018).
[73] *Brinkman v. Nasseff Mech. Contractors Inc.*, 251 F. Supp. 3d 1266, 1275 (D. Minn. 2017).
[74] *Id.* (quoting *Mader v. United States*, 654 F.3d 794, 814 (8th Cir. 2011) (en banc)).

experienced with receiving his mail do not constitute extraordinary circumstances sufficient to warrant equitable tolling.[75]

Nor would English's prison transfers constitute extraordinary circumstances sufficient to warrant equitable tolling. Numerous courts have concluded that "[o]rdinary incidents of prison life, such as being placed in segregation or being transferred from one prison to another, are not the type of extraordinary events that make it impossible to file a timely habeas petition."[76]

Ordinary prison transfers and issues with mail "may . . . ma[k]e it more difficult to file a timely § 2255 motion, [but] increased difficulty does not, by itself, satisfy the required showing of extraordinary circumstances."[77] Rather, such issues are ordinary and routine matters with which prisoners must deal every day. To

---

[75] *See also Moses v. Home Depot Inc.*, No. CV162400MASDEA, 2017 WL 2784710, at *7 (D.N.J. June 27, 2017) ("a delay solely caused by the inability to read an e-mail message is not an extraordinary circumstance that justifies equitable tolling"); *Bey v. Rozum*, No. CV 13-325, 2015 WL 12618788, at *3 (E.D. Pa. Aug. 21, 2015) (finding "no authority supporting the principle that ordinary delays due to mail transport trigger equitable tolling and find[ing] the argument unconvincing given the widespread use of the mail in informing litigants of their rights and obligations, which makes Bey's situation far from 'extraordinary' and therefore insufficient to warrant equitable tolling"), *report and recommendation adopted*, No. CV 13-325, 2016 WL 5404455 (E.D. Pa. Sept. 27, 2016).

[76] *Harper v. United States*, No. 4:07-CR-00339, 2012 WL 32920, at *5 (M.D. Pa. Jan. 6, 2012). *See also Powell v. United States*, No. 21-12432-J, 2022 WL 2811987, at *1 (11th Cir. Feb. 8, 2022) ("This Court has recognized that, under its precedent, lockdowns and periods in which a prisoner is separated from his legal papers are not 'extraordinary circumstances' in which equitable tolling is appropriate. Likewise, 'routine' transfers between prisons by themselves are not 'extraordinary circumstances'" (internal citations and quotation marks omitted)); *Johnson v. Hill*, 224 F. App'x 641, 641 (9th Cir. 2007) (concluding that appellant had failed to demonstrate that "frequent transfers between facilities were an 'extraordinary circumstance'"); *Coker v. United States*, No. CV 13-0349 (FLW), 2016 WL 310751, at *5 (D.N.J. Jan. 26, 2016) ("difficulties of prison life, such as transfers, do not, standing alone, establish the type of extraordinary circumstances that would warrant equitable tolling").

[77] *United States v. Thomas*, 713 F.3d 165, 174-75 (3d Cir. 2013).

conclude that such ordinary incidents of prison life merit equitable tolling would eviscerate the requirement that circumstances be "extraordinary" and would transform the use of the doctrine of equitable tolling from "sparing"[78] to frequent.

In sum, English's § 2255 motion was untimely filed, and he has demonstrated neither diligence nor exceptional circumstances that would warrant equitable tolling. Accordingly, English's motion is time-barred, and will be denied as such.

### B.    Merits of the Motion

Because English's motion is time-barred, the Court need not address the merits of his motion. However, even if English's motion were timely filed, it would be without merit.

### 1.    Allegations of Ineffective Assistance of Counsel

English first argues that his plea counsel was ineffective in failing to call witnesses to rebut the Government's case regarding the sentencing enhancements for possessing a firearm during the conspiracy and being a leader or organizer of the conspiracy.[79]

"In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims."[80] "The first part of the *Strickland* test requires 'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant

---

[78] *Ross*, 712 F.3d at 799.
[79] Doc. 1544.
[80] *United States v. Bui*, 795 F.3d 363, 366 (3d Cir. 2015).

by the Sixth Amendment.'"[81] In determining whether an attorney's performance is deficient, courts must "determine whether, in light of all the circumstances, the [attorney's] acts or omissions were outside the wide range of professionally competent assistance."[82] As the United States Supreme Court has emphasized:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[83]

"The second part [of the *Strickland* test] specifies that the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"[84] "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable."[85] When a conviction results from a guilty plea, prejudice is shown when the movant

---

[81]  *Id.* (quoting *Strickland*, 466 U.S. at 687).
[82]  *Strickland*, 466 U.S. at 690.
[83]  *Id.*
[84]  *Bui*, 795 F.3d at 366 (quoting *Strickland*, 466 U.S. at 694).
[85]  *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks omitted).

demonstrates "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[86]

Here, English can establish neither deficient performance nor prejudice. As to claims that counsel was ineffective for failing to call witnesses to rebut the enhancement for possession of a firearm, a sentencing enhancement pursuant to USSG § 2D1.1(b)(1) is appropriately applied "if a dangerous weapon was possessed by the defendant in the course of a drug trafficking offense . . . unless it is clearly improbable that the weapon was connected with the offense."[87]

During the change of plea colloquy, English admitted that he "received firearms from heroin customers and paid them heroin or cash for the guns."[88] Of equal importance, as this Court found during sentencing, wiretapped conversations established that "on at least two occasions, December 4, 2016, and December 6, 2016, Mr. English dealt in trades of heroin for guns."[89] Although there is a plethora of additional evidence that establishes English possessed firearms during the conspiracy,[90] it is the above-mentioned facts that doom English's claim of ineffective assistance of counsel. Given that English admitted that he traded heroin

---

[86]  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

[87]  *United States v. Drozdowski*, 313 F.3d 819, 820 (3d Cir. 2002) (quoting USSG § 2D1.1(b)(1) cmt. n. 3).

[88]  Doc. 1434 at 23. *See id.* at 24 (English agreeing with facts with the exception of statements related to him being a leader or manager of the conspiracy).

[89]  Doc. 1408 at 26-27.

[90]  *See* Doc. 1601 at 40-41 (Government detailing evidence that English possessed firearms in connection with the offense).

and cash for firearms, and that English was recorded discussing the exchange of heroin for firearms, there is simply no way in which one or more witnesses could demonstrate that English did not possess firearms in connection with the offense. Given the irrefutable evidence that English possessed firearms during the conspiracy, he suffered no prejudice from plea counsel's failure to call English's codefendants to testify.

As to the sentencing enhancement for being a leader or organizer of the conspiracy, "[a] defendant merits a four-level Guidelines enhancement if he was an 'organizer or leader of a criminal activity that involved five or more participants.'"[91] "To qualify, he must have 'exercised some degree of control over others involved in the commission of the offense.'"[92] "The Government must prove only that he controlled at least one person within the larger scheme, not five."[93]

Here, the evidence again overwhelming established that English was an organizer and leader of the conspiracy. First, it is uncontested that the conspiracy involved five or more people, and English admitted during the change of plea hearing that more than five people were involved in the conspiracy.[94]

---

[91] *United States v. English*, 804 F. App'x 144, 146 (3d Cir. 2020) (quoting USSG § 3B1.1(a)).

[92] *Id.* (quoting *United States v. Helbling*, 209 F.3d 226, 243 (3d Cir. 2000)).

[93] *Id.* (citing USSG § 3B1.1 cmt. n.2; *United States v. Felton*, 55 F.3d 861, 864 (3d Cir. 1995)).

[94] Doc. 1434 at 18, 24-25. *See* Docs. 1589 at 5-6, 1602 at 7-8 (contesting that English was a manager or organizer of the conspiracy, but not that the conspiracy involved five or more people).

Second, the evidence strongly demonstrates that English was a leader of that conspiracy and "controlled at least one person within the larger scheme."[95] Critically, at the change of plea hearing, English admitted to facts that demonstrated that he controlled at least one other individual—Corey Hughes—who English sent to conduct a drug transaction on English's behalf.[96] English arranged a heroin sale with an individual who was, unknown to English, a confidential human source for law enforcement, but it was Hughes who arrived at the meeting and sold to the individual the amount of heroin agreed upon by English for the price agreed upon by English.[97] This demonstrates that English controlled at least one other individual in the conspiracy.

English further admitted that he distributed heroin to customers in a large geographical area,[98] that he sold enough heroin in the Williamsport, Pennsylvania area to drive the price of heroin down from twenty dollars to ten dollars,[99] and discussed high-level information with another coconspirator, including potential law enforcement investigations into the conspiracy, arrests, heroin seizures, and various federal indictments.[100] These facts further indicate that English was a leader in the conspiracy.

---

[95] *English*, 804 F. App'x at 146.
[96] Doc. 1434 at 21.
[97] *Id.* at 21.
[98] Doc. 1434 at 20, 26.
[99] Doc. 1330-1 at 5.
[100] Doc. 1330 at 6-7.

Despite these damaging facts, plea counsel argued effectively, but ultimately unconvincingly, that English was not a leader or organizer in the conspiracy.[101] Rather, plea counsel argued, English was simply one more person in the conspiracy selling heroin from cell phones—and cell phone numbers—that were frequently passed between different members of the conspiracy.[102] Although this argument was ultimately unsuccessful, it cannot be said that counsel was ineffective in making that argument. Moreover, given the strong evidence in support of the leadership enhancement, English cannot establish that he suffered any prejudice from counsel's failure to call witnesses to testify on this point. English's claims of ineffective assistance of counsel therefore also fail on their merits.[103]

---

[101]  Doc. 1408 at 20-22.

[102]  *Id.*

[103]  To the extent that English asserts that plea attorney was ineffective for stating that English would receive a sentence of no more than 17 years' imprisonment, Doc. 1602 at 4-5, the Third Circuit has long held that "[w]hen addressing a guilty plea, counsel is required to give a defendant enough information to make a reasonably informed decision whether to accept a plea offer," which necessarily includes "the comparative sentence exposure between standing trial and accepting a plea offer." *United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015). "However, an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where an adequate plea hearing was conducted." *Id.* Rather, "all that the law requires is that the defendant be informed of his/her exposure in pleading guilty. The law does not require that a defendant be given a reasonably accurate best guess as to what his/her actual sentence will be; nor could it, given the vagaries and variables of each defendant's circumstances and offending behavior." *Id.* (internal quotation marks omitted). Here, the Court conducted a thorough plea colloquy with English wherein he was told, and stated that he understood: the minimum and maximum sentences that he faced; that any Sentencing Guidelines range was advisory only; that any estimates of the potential sentence that he faced were estimates only and the Court was free to impose the maximum penalties available; that no one could guarantee what sentence English would receive; and that any terms of the plea agreement were recommendations only and could be disregarded by the Court. Doc. 1434 at 8-12, 16-17. Given this, the Court finds no ineffective assistance of counsel as to any statement made by plea counsel that English would likely receive a sentence of no more than 17 years' imprisonment.

## 2.    Whether the Plea was Knowing and Voluntary

Finally, English asserts that his guilty plea was not knowing and voluntary,[104] as his plea attorney entered his appearance in the case shortly before the change of plea hearing, leaving English with an "impossible . . . decision—seek a continuance or accept a guilty plea to hope that he would receive a more lenient sentence."[105] Based on these same facts, English also contends that he was denied his Sixth Amendment right to counsel.[106]

The Court finds that English plea was knowing and voluntary. First, the Court conducted thorough plea colloquy and established that English was competent to plead guilty, understood his rights, and understood that he was waiving his rights to trial; English further agreed that he was guilty of the offense to which he pled guilty. As this Court summarized during the hearing, English's plea was "a knowing and a voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense" to which he pled guilty and, in pleading guilty, he was "acting voluntarily and not as a result of force or threats or promises, that he underst[ood] his rights, the consequences of his plea, and he voluntarily waive[d] his right to trial."[107]

---

[104]  Doc. 1544 at 7.
[105]  Doc. 1589 at 4-5.
[106]  Doc. 1544 at 8.
[107]  Doc. 1434 at 27.

Moreover, contrary to English's assertion in his § 2255 motion, plea counsel asserts that he had adequate time to prepare for trial despite having been appointed only 36 days prior to trial. Specifically, plea counsel notes that English's prior attorney was plea counsel's associate, and plea counsel "agreed to accept the case because he was familiar with the Indictment and could pick up where [prior counsel] had left off."[108] Plea counsel further asserts that he was preparing for trial when English stated that he wished to plead guilty.[109] The Court finds that plea counsel was able to adequately prepare for trial, which avoided the "impossible" choice that English asserts was foisted upon him.

Additionally, the plea agreement that English signed provided him with substantial benefits. Not only did the Government agree to drop several of the charges against English but, as English acknowledges, the Government also agreed to forego filing a 21 U.S.C. § 851 notice, which would have increased English's mandatory minimum sentence from 10 years' imprisonment to 20 years' imprisonment.[110] In light of these facts, the Court cannot agree that English's plea was not knowing and voluntary, or that counsel was ineffective in arranging the plea agreement.

English nevertheless asserts that his plea was not voluntary because counsel stated that English must agree with what the Court said to him or he would lose

---

[108]   Doc. 1601-1 at 3.
[109]   *Id.* at 3-4.
[110]   Doc. 1544-1 at 2.

credit for acceptance of responsibility.[111] There are three problems with this assertion. First, although English now asserts vaguely that counsel informed English that he must "agree with w[h]at the Judge says because, if I speak up, I would lose my acceptance of responsibility,"[112] that assertion runs contrary to what English stated during the change of plea hearing, when English attested that he was pleading guilty of his own free will and that no one had made any threats to coerce him into pleading guilty.[113]

Second, and relatedly, English's affidavit contains assertions that are directly—and irreconcilably—contradicted by other evidence, including the statements he made during the change of plea hearing and a letter that he sent to plea counsel. For example, in his affidavit, English states that his attorney assured him that he "would not receive more than 17 years[']" imprisonment.[114] However, this is contradicted by English's statement in the change of plea hearing that no one had "promise[d] or offer[ed] [him] anything other than the written plea agreement in order to get [him] to plead guilty."[115] And while English states in his affidavit that he was pressured to plead guilty because plea counsel was entirely unprepared for trial, in a letter that English wrote to plea counsel, English stated—in direct

---

[111]   Doc. 1602 at 6.
[112]   Doc. 1544-1 at 4.
[113]   Doc. 1434 at 17.
[114]   Doc. 1544-1 at 2. *See id.* at 3 (stating that counsel assured English "I would receive less than 20 years").
[115]   Doc. 1434 at 17.

contradiction to that assertion—that he decided to plead guilty "to make things easier for [plea counsel]. I didn't want you stuck with a 6 week trial, knowing you have other things to do and money to make."[116]

Third, the questions propounded to English by the Court generally did not require any form of "agreement." Rather, the majority of the questions asked of English required yes or no answers to basic questions about English's competence and his understanding of the change of plea process, his rights, and the plea agreement.[117] English was just as comfortable answering no to questions as he was yes, having answered no to the Court's questions on eight occasions.[118] Moreover, English was plainly comfortable disagreeing with topics raised during the change of plea hearing, given that he disagreed with the factual statement regarding his crime that was put forth during the hearing.[119] Given these issues, the Court gives little weigh to the assertions that English makes in his affidavit, and concludes that no error occurred in his guilty plea that would have rendered the plea unknowing or involuntary, or have deprived him of his right to counsel.

### C.    Certificate of Appealability

Because this Court will deny English's § 2255 motion, this decision will not be appealable unless this Court or a circuit justice issues a certificate of

---

[116] Doc. 1601-1 at 9-10.
[117] *See* Doc. 1434.
[118] *Id.*
[119] *See id.* at 24.

appealability.[120] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."[121] To satisfy this standard English must demonstrate that reasonable jurists would find that the Court's assessment of the constitutional claims is debatable or wrong, and that and its procedural ruling is debatable or wrong.[122] This Court finds that English has not met this burden, and the Court therefore declines to issue a certificate of appealability.

## III.    CONCLUSION

For the foregoing reasons, English's 28 U.S.C. § 2255 motion will be denied. The Court will also deny a certificate of appealability.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[120] 28 U.S.C. § 2253(c)(1)(B).

[121] *Id.* § 2253(c)(2).

[122] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).